## THE ARPILLAO.

### (District Court, S. D. New York. February 21, 1917.)

### No. 45.

1. SHIPPING &⇒141(1)—LIABILITY FOR LOSS OF CARGO—LEAKAGE—EXEMPTION IN BILLS OF LADING.

Under a bill of lading exempting the ship from liability for leakage, it cannot be held responsible for loss by leakage, unless it be shown that there was negligence in the loading, stowing, or carriage of the cargo.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 493, 497, 499.]

2. SHIPPING &⇒132(5)—LIABILITY FOR LOSS OF CARGO—LEAKAGE.

Bills of lading for shipments of olive oil in barrels from Spanish ports to New York, which bore the signature of the shipper's agent, exempted the ship from liability for breaking and leaking, and also contained a notation, "Some barrels leaking." The evidence showed that the barrels were stowed in the usual and customary manner, but on arrival in New York some were found to be empty and others partially empty. Held, that the evidence was not sufficient to sustain the burden of proof resting on the shipper to establish such negligence as would deprive the ship of the benefit of the exemption in the bills of lading.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 483, 484.]

In Admiralty. Suit by the Pompeian Company against the steamship Arpillao; Jose Taya Sons & Co., claimants. Decree for respondents.

Morris & Samuel Meyers, of New York City, for libelant.
Harrington, Bigham & Englar, of New York City, for claimants.

MANTON, District Judge. The libel filed in this litigation seeks to recover $10,000 damages against the ship for the loss of 6,828 gallons of olive oil; 450 barrels were shipped on April 25, 1916, from the port of Barcelona, Spain, and 550 hogsheads on April 27, 1916, from the port of Tarragona, Spain, to New York. Bills of lading for both shipments were delivered to the shipper and have been received in evidence. The ship had a miscellaneous cargo, consisting of rags, skins, wines, and other products. The vessel arrived at the Brooklyn Terminal, Pier 5, Bush's Dock, and there it was found that 34 barrels were entirely empty, and about 100 barrels were partially empty, with a loss of about 2,200 gallons of the Barcelona shipment and 4,440 gallons of the Tarragona shipment.

The libelant's witness, Hurwitz, swore that he saw the shipment loaded; then a few barrels were found to be leaking, but these were recoopered, their staves were tightened, and they were put in first-class condition. The captain says that the barrels of the Barcelona shipment were leaking when loaded, and this fact was noted on the bill of lading. His first and second officer gave similar testimony, testifying that the Tarragona shipment was leaking. Hurwitz says that he remained at Barcelona for about a day and a half attending to other business, and then went to Tarragona to look over the barrels there, and found them in apparently good condition. He said he

left his coopers at Tarragona and Barcelona for the purpose of examining and repairing the barrels when they were loaded. It appears, therefore, that the libelant has no direct evidence, except that of Hurwitz, showing the condition of the barrels after the coopering and when actually loaded upon the ship, for the reason that we have not the testimony of the coopers.

Andrea Rosa was the libelant's shipping agent at Barcelona, and his signature appears on the bill of lading from that port. It contains the indorsement, in Spanish, "Not responsible for breaking, leaking; some barrels leaking." Mr. Rosa's testimony was not taken, and there can be no conflict of the claim of the claimant that this indorsement was written on the bill of lading at the time of shipment. In view of the testimony of the crew of the ship, the notation made on the bill of lading, and the fact that there was a leakage, I am forced to the conclusion that the barrels were shipped with "some barrels leaking."

[1, 2] The bill of lading, containing a clause exempting the ship from liability for leakage, the ship cannot be held responsible, unless it be shown that there was negligence in the loading, stowing, and the carriage of the cargo from Spain to the Brooklyn pier. Konigin Louise, 185 Fed. 478, 107 C. C. A. 578; Lennox (D. C.) 90 Fed. 308; Good Hope, 197 Fed. 149, 116 C. C. A. 573; Sao Paulo, 207 Fed. 51, 124 C. C. A. 611; Doheer v. Houston, 128 Fed. 594, 64 C. C. A. 102. The Harter Act (27 Stat. 445, Comp. Stat. 1913, § 8029) providing:

"Section 1. That it shall not be lawful for the manager, agent, master, or owner of any vessel transporting merchandise or property from or between ports of the United States and foreign ports, to insert in any bill of lading or shipping document, any clause, covenant, or agreement whereby it, he, or they shall be relieved from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery of any and all lawful merchandise or property committed to its or their charge. Any and all words or clauses of such import inserted in bills of lading or shipping receipts shall be null and void and of no effect"

—is not of assistance to the libelant here, for the claimant does not seek to be excused for any of the reasons which are stated in the act; but the claimant seeks to be excused by reason of the provision which exonerates it from obligation where there is breakage or leakage. It claims that, under the facts disclosed by this testimony, there was a leakage at the time the cargo was accepted, and that it was accepted with the notation that there were leaking barrels, and this damage was due to a condition not caused by negligence in loading or stowage. The libelant rests its case upon the testimony of Hurwitz, which was taken by deposition, and which would indicate that there was no leaking of the barrels at the time of shipment, and it claims that the barrels were not properly stowed, and that this fact was ascertained at the time the cargo was being removed from the ship, and claim of damage to the cargo is demonstrated by photographs offered in evidence which indicate a breakage of the barrels at the bilges.

Considerable testimony was received as to the proper method of loading cargoes of this character. The usual and customary method

seems to be to load one barrel on top of four barrels, or bilge and cant-line. With this method, the barrels should be tiered six or seven high, and then a supporting platform built above, which would relieve the pressure of other tiers of barrels placed on top. The evidence indicates that this method of stowing was followed by the ship. Chocks were used to guard against the oscillation or rolling of the ship, and to keep the barrels reasonably safe in position. Some claim is advanced that the material of which the chocks were made was not proper wood, but there is no evidence upon which I can base a finding that the claimant was negligent in this respect.

If the barrels were leaking, and some of them became empty thereby, it might well be that the empty barrels did not support the weight of the upper barrels, and thus caused a break of the staves, and explain the condition of some of the barrels as shown by the photographs and as narrated in the testimony. It was upon this theory that the ship was relieved from liability in Konigin Louise, 185 Fed. 478, 107 C. C. A. 578 (Second Circuit). In this case the libel was to recover the leaked-out portion of a consignment of barrels of commercial olive oil shipped from Smyrna to New York, and a portion of the freight covering the same. The bill of lading provided that the owner was not responsible for breakage, leakage, land damage, or other injury resulting from the natural condition of the goods shipped or other deficiency of packing not externally recognizable. There was stamped across the bill of lading the indorsement, "Not accountable for leakage or breakage." The Circuit Court of Appeals there said:

"That clause prevails over the one referring to 'leakage and breakage' in the printed form, and makes Doheer v. Houston inapplicable. We have then a case where all that appears is that the leakage and breakage is greatly in excess of the ordinary percentage."

And further:

"The Patria, 132 Fed. 972, 68 C. C. A. 397, we cannot find that there was negligence of the ship, which would deprive it of the benefit of the exception as to 'loss or damage from heat.'"

Under the circumstances disclosed by this evidence, the burden of proof is upon the libelant to establish negligence on the part of the ship in stowing. This it has failed to do. The stevedores who unloaded the ship and the crew contributed forceful evidence, which I must accept as disclosing the facts herein. The testimony of surveyors and other men, who saw the cargo while it was in the process of unloading, I do not deem of sufficient weight to overcome the testimony offered by the shipowners, particularly in view of what I must find to be the fact that the barrels were leaking at the time the cargo was shipped.

In Isaac Reed (D. C.) 82 Fed. 566, the court said:

"Under the contract in this case the carrier was only required to exercise reasonable and customary skill in stowing the cargo, as contradistinguished from unusual or extraordinary care; and the fact that a portion of the cargo got 'adrift' and was damaged, while the ship was laboring and straining during a heavy gale, is not sufficient to show improper stowage, as against the positive testimony of a competent witness that the cargo was stowed with reasonable or customary care."

It might well be that, in the rough weather encountered on May 3d and 4th, these barrels, emptied by leakage, gave way because they had been weakened by the loss of their contents. The partial collapse of the barrels would be explained by the natural breaking and pressure of the cargo.

I will therefore grant a decree dismissing the libel.