### THE ARPILLAO. *

(Circuit Court of Appeals, Second Circuit. December 15, 1920.)

No. 1.

1. **Shipping** ⊜132(3)—**Excessive loss does not relieve burden of proving negligence.**

Where the bill of lading for a shipment of oil in barrels contained the usual exceptions against liability for leakage or breakage, the fact that the leakage was 10 times that ordinarily to be expected is not of itself sufficient to establish a prima facie case of negligence against the carrier, but still leaves it incumbent upon libelant to show negligence overcoming the exception.

2. **Shipping** ⊜132(5)—**Evidence held to show negligent stowage of oil in barrels.**

Evidence that when barrels of olive oil were properly stowed there was no direct pressure on the bilge and that the barrels in question were crushed at the bilge around the bunghole, though the vessel had encountered no unusual storms and her crew testified the cargo did not shift, *held* to show improper stowage of the oil.

3. **Shipping** ⊜141(2)—**Bad stowage is negligence.**

Bad stowage of a cargo of barrels of olive oil is negligence for which the shipper can recover notwithstanding an exception in the bill of lading against leakage or breakage.

4. **Shipping** ⊜132(5)—**Ship's copy of bill of lading with admission of condition held incompetent.**

The contract of shipping is the bill of lading delivered to the shipper, not that retained by the ship, so that a ship's copy containing an admission of defective barrels written above the space for the master's signature is incompetent where it was identified only by proof of the authenticity of the signature by the shipper's agent who testified contrary to the admission.

5. **Evidence** ⊜407(2)—**Bill of lading as contract but not as receipt is within parol evidence rule.**

A bill of lading has a dual aspect; as a contract it is not to be varied by parol evidence, but as a receipt it is, like other receipts, subject to contradiction or explanation of proof of the facts.

6. **Interest** ⊜53—**Interest disallowed during time hearing was delayed.**

Where the hearing on appeal from a decree dismissing the libel was delayed at the suggestion of libelant for more than two years with no reason being given therefor, libelant will not be allowed, after reversal of the decree and award of damages, to recover interest on the damages during the period the appeal was delayed.

Appeal from the District Court of the United States for the Southern District of New York.

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 254 U. S. ——, 41 Sup. Ct. 377, 65 L. Ed. ——.

Libel by the Pompeian Company against the steamship Arpillao; the Jose Taya Sons Company, claimant. From a decree dismissing the libel (241 Fed. 282), libelant appeals. Reversed, and damages awarded to libelant.

Libelant was the owner of about a thousand barrels of olive oil, laden on the Spanish steamer Arpillao in Spain, for carriage to New York City. The steamer arrived after a voyage subjecting her to no unusual or unexpected peril of the sea and discharged her cargo. Thirty-nine oil barrels were found entirely empty and 30 barrels more had lost part of their contents, and all 69 were more or less "pressed and crushed," according to the uncontradicted evidence of a surveyor for one of the insurance companies concerned. The oil had been shipped under bills of lading containing usual exceptions against liability for leakage and/or breakage.

Alleging negligence in the "handling, stowing and dunnaging" of the cargo, libelant brought this suit to recover as damages the value of the lost oil. The trial court dismissed the libel; libelant appealed.

Morris & Samuel Meyers, of New York City (Walter C. Noyes and Morse S. Hirsch, both of New York City, of counsel), for appellant.

Harrington, Bigham & Englar, of New York City (T. Catesby Jones and Vine H. Smith, both of New York City, of counsel), for appellee.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1] It is proven that the expected and usual leakage of olive oil in barrels during a voyage across the Atlantic is, if the containers are sound and well stowed, not over 1 per cent. of the shipment. It is admitted that this cargo lost almost exactly 10 per cent.

We adhere to rulings of which the most frequently quoted is The St. Quentin, 162 Fed. 883, 89 C. C. A. 573 (and see also The Good Hope, 197 Fed. 149, 116 C. C. A. 573, and cases cited), to the effect that where the cause of cargo loss is covered by a valid exception, mere excessive or unusual loss is not in and of itself sufficient to establish a prima facie case of negligence against the carrier.

Therefore, although the percentage of loss on this cargo is in the absence of severe storms or other excessive maritime dangers most unusual, proof of this fact still leaves it incumbent on libelant affirmatively to show negligence overcoming the exception; neither the burden of proof nor the burden of evidence has been shifted by the fact of excessive loss.

That crushing and destruction of packages is some evidence of negligent stowage (Doherr v. Houston [D. C.] 123 Fed. 334, affirmed 128 Fed. 594, 64 C. C. A. 102) does not, as has been suggested in argument, militate against the rule as above stated.

[2] Thus the question presented by this appeal is one of fact only, viz., whether libelant has by a fair preponderance of evidence proved the negligence alleged in the libel, which negligence on this record must consist in bad stowage if it exists at all.

It is in evidence from both sides of the case that the barrels containing libelant's oil were good barrels, well made of excellent material; it is shown without denial that they were recoopered as they went

aboard, and it is equally well shown by photographs taken on discharge that some of the empty barrels came out of the ship crushed at the bilge, i. e., the shook containing the bung was actually squeezed in. It is said, and not denied, that the taking of photographs other than the three in evidence was prevented by the men on the receiving dock in New York.

It is also admitted that the only proper way of tiering barrels is to place them "bilge and cant-line," or "one on four." This means that a lower tier having been laid, chocked, and dunnaged, each second tier barrel rests on its bilge with the bung uppermost on the adjacent ends of the four barrels underneath. By this means, assuming a reasonable similarity in size in the tiered barrels and proper chocking, it is obvious that there will never be any pressure upon the bung, and no barrels will lie bilge touching bilge.

There is admittedly also a limit to the tiering of barrels one on the other, and it is customary and necessary to interpose platforms of planks when a tier has got high enough and then begin another tier on top of the platform. We think it shown that the tiering on the Arpillao was carried at least as high as safety permitted, but do not find it as proved that there was any absence of platforms. To go further into the details of evidence would serve no useful purpose, it being enough to state our conclusion that we consider it shown by a fair preponderance of evidence that when the Arpillao arrived in New York and lay in safety at her dock many of the barrels were lying, and were seen to be lying, bilge to bilge. We also conclude that the kind of injury shown at the bungs of the photographed barrels has not been and cannot be explained otherwise than by a finding that not only were these injured barrels bilge to bilge with some others, but that that portion of the bilge containing the bung was exposed to great and unnecessary pressure.

The direct evidence as to chocking and dunnage does not reveal by a fair preponderance of evidence any negligence in these respects; but one of two things is plainly true, i. e., the 69 barrels that were pressed and crushed were either originally improperly stowed in the particulars above pointed out, or the cargo shifted on a voyage where there is no pretense to a sea peril reasonably productive of such disaster.

[3] Respondent's witnesses, who had the best chance of seeing the cargo in situ, all say that there had been no shifting of the cargo, and there ought not to have been; but it was bad stowage so to arrange the cargo that injuries of the admitted kind occurred; and bad stowage is negligence.

[4] We think the learned court below gave weight to an offer of evidence which we reject. Claimant produced the ship's copy of the bill of lading, a document which (apparently according to some Spanish custom suggested but unproved) was signed by, or at any rate contains the signature of, a man described as the shipping agent for the buyer (of oil) of libelant. Not over this man's signature, but over the place for that of the captain (who, however, did not sign the copy), is written in Spanish, "Not responsible for breaking, leaking, some barrels leaking." No such words are found in the original bill.

It is urged that the above constitutes an admission of the condition of the cargo of great evidential value.

[5] Even a bill of lading has a dual aspect; as a contract it is not to be varied by parol evidence, but as a receipt it is like other receipts, subject to contradiction or explanation by proof as to the facts. Vanderbilt v. Ocean, etc., Co., 215 Fed., at 888, 132 C. C. A. 226. But this ship's copy is not a bill of lading at all; the contract is the paper issued to the shipper and in this case produced by the libelant. The Thames, 14 Wall. 98, 20 L. Ed. 804.

It was this shipping agent's principal who testified to his personal knowledge of the condition of the shipment as it went aboard. As against such testimony the admission (if it be one) is of no weight. But there is no other evidence concerning it except the existence of the copy bill of lading and identification of the shipping agent's signature. Under such circumstances, while not denying that a shipper may make most injurious written admissions by signing any document, we think the legend on the ship's copy was not even competent.

[6] The decree must be reversed with costs and the libelant awarded reasonable damages to be computed before a commissioner. We note, however, that the apostles on this appeal were lodged in this court in the spring of 1918. The cause appeared on our calendar for the October term ensuing. It would have been reached in regular call on or before October 11, 1918. At the suggestion of libelant, hearing was deferred until the case was set for argument on the Day Calendar of November 8, 1920, and was actually argued three days later. Except by oral statements at bar we have no knowledge as to the reason for this delay, but on this appeal libelant was the prime actor. It has presented the same case as was ready for hearing two years ago. Such delays seem to us inexcusable, and it is ordered: That upon the damages as assessed the libelant shall recover interest for a period two years and one month less than that for which it would normally obtain recovery.