## THE BENCLEUCH.

(Circuit Court of Appeals, Second Circuit. December 14, 1925.)

### No. 73.

1. Shipping ⚖⇒132(3)—Libelant must prove negligence of ship, after showing that loss was within exceptions contained in bills of lading.

Where ship had showed that loss was within exceptions in bills of lading, libelant had the burden to show some fault in stowage or care of cargo, amounting to negligence on part of ship; Harter Act (Comp. St. §§ 8029–8035) being inapplicable.

2. Shipping ⚖⇒132(5)—More than usual loss from breakage is not prima facie evidence of negligence in stowage.

More than usual damage from breakage is not prima facie evidence of negligence in stowage.

3. Shipping ⚖⇒132(5)—Evidence held to show that cargo of lemons was properly stored.

In libel for loss due to damages to lemons shipped, evidence held to show that the cargo was properly stored.

4. Shipping ⚖⇒126—Ship, having no part in discharge of cargo, is not liable after cargo clears rail.

Ship, having no part in discharge of cargo, is not liable after cargo clears the rail.

5. Shipping ⚖⇒126—Use of slings in unloading cargo of lemons held improper.

Use of slings in unloading cargo of lemons held improper.

6. Shipping ⚖⇒132(3)—Burden on libelant to distinguish recoverable from nonrecoverable damage.

Libelant being entitled to recover damages to lemons during unloading and transferring on wharf, but not damages during shipment, the burden rests on him to show the recoverable damages, separate and distinguished from nonrecoverable damage.

7. Shipping ⚖⇒142—Damages may not be recovered for goods removed before notice was given, where bills of lading required notice to be made.

Where bills of lading exempt the company from any claim, notice of which was not given before removal of goods, damage may not be recovered for any goods removed before notice,

and a libel filed in rem against the ship is not a compliance with such requirement.

8. **Shipping** 209(3)—**Amendment relevant only on reference erroneously refused, when application was made before reference had begun.**

Amendment of answer setting up clause in limitation of liability, applied for before reference ordered by trial judge had begun, and which sought to set up matters relevant only on the reference, *held* erroneously refused.

9. **Shipping** 142—**Clause in bills of lading requiring notice of damage before removal does not apply to lemons seized and condemned by board of health.**

Clause in bills of lading exempting company from any claim, notice of which was not given before removal of goods, did not apply as to lemons seized and condemned by the board of health.

10. **Shipping** 132(5)—**Admission in bills of lading that lemons were received in apparent good order and condition only creates prima facie proof that lemons, so far as visible, were not damaged.**

Admission in bills of lading that lemons were received in apparent good order and condition goes no farther than to create prima facie proof that lemons, so far as visible, were not damaged, and was not proof that fruit was inherently sound.

11. **Shipping** 131—**Where libelant is responsible for two years' delay after filing libels, interest will not run during that time.**

Where there was a delay of two years after filing of libel, for which libelant is responsible, interest will not run during such delay.

Appeal from the District Court of the United States for the Eastern District of New York.

Libel by Charles L. Fuller against the steamship Bencleuch, etc., claimed by George McMillan, wherein the Cunard Steamship Company, Limited, and another, were impleaded under the fifty-sixth rule. From a decree dismissing the libel against the ship, and decree against the Cunard Steamship Company (3 F.[2d] 824), the Cunard Steamship Company appeals. Decree affirmed as to claimant, and reversed as to the Cunard Steamship Company, with directions.

Fuller, the libelant, is the assignee of the claims for damages of a number of importers of lemons on the steamer Bencleuch on a voyage from Messina to New York in June and July, 1917. On arrival the out-turn showed a number of cases crushed and the lemons injured, and other cases blackened by moisture. The discharge was made in slings, 9 to 11 cases to the sling, and the proof was that in the slings and in landing the cases upon the docks they were further damaged. On the wharf the marks were con-

fused and there was a delay in delivery. For one reason and another some of the lemons rotted, and the board of health of the city of New York seized a portion and condemned it.

The ship was being operated by the Cunard Steamship Company on behalf of the British government in war time, which company laded the Bencleuch at Messina and discharged her at New York. It gave bills of lading in its own name, signed by the master in usual form, which contained exceptions against breakage and decay, and also the following provision: "The company is not liable * * * for any claim of which notice has not been given before the removal of the goods, * * * nor in any case for more than the proportionate part, the declared or invoice value of the goods damaged or lost, whichever shall be least."

The libel was in rem, and upon arrest of the ship the master appeared as claimant, answered by petition, and under the fifty-sixth rule brought in the Cunard Steamship Company, which answered, and in turn brought in the discharging stevedores in New York. Upon the trial the District Court dismissed the libel against the ship and the libel and petition against the stevedores, but held the Cunard Steamship Company for all damages, and referred the cause to a commissioner. After long delay the commissioner reported the damages at some $16,000, with interest of $6,000, on which a final decree was eventually issued, from which the Steamship Company appealed. Upon the appeal the company raised no question of the dismissal of its petition against the stevedores, but insisted that the ship was liable for any damage which occurred on board, and that it was itself exempt from all liability.

Franklin Grady, of New York City, for appellant.

Frank I. Finkler, of New York City, for libelant-appellee.

Robert S. Erskine, of New York City, for claimant-appellee.

Before ROGERS, MANTON, and HAND, Circuit Judges.

HAND, Circuit Judge (after stating the facts as above). [1] The damage done upon the ship must be distinguished from that done in the slings and on the piers. The first was of two kinds, breakage and decay, against both of which the bills of lading contained exceptions. Therefore, since the ship had showed that the loss was within the exceptions, the

libelant must prove some negligence on the ship's part. Nelson v. Woodruff, 1 Black, 159, 17 L. Ed. 97. The Harter Act (Comp. St. §§ 8029–8035) has nothing to do with this situation. There was no attempt in the bills of lading to exempt the ship from liability for careless stowage, at least unless by contact with other goods; nor is the warranty of seaworthiness involved, because the damage did not arise from anything which could be attributed to unseaworthiness. Hence the libelant had the burden to show some fault in stowage or care of the cargo. As to decay, none such was shown or even attempted. The sweat was no more than inevitable, proper ventilation being shown, and if the decay was accelerated because of the breakage, that was one of its consequences, and stands or falls with it.

[2, 3] Therefore we confine our discussion to the breakage, remembering on whom the burden rests. In this circuit it is the established rule that mere excess of damage over what is usual under the circumstances is not prima facie evidence of negligence in stowage. The St. Quentin, 162 F. 883, 89 C. C. A. 573; The Arpillao (C. C. A.) 270 F. 426. The learned judge below appears to have ignored this rule, and assumed that the excessive breakage was itself proof that the stowage was negligent. On the contrary, the proof is that the cargo was properly stowed. In the 'tween-decks there could be no question; there only 6 tiers were piled, and that was a moderate burden for the lowest tier. Indeed, little damage occurred there anyway. In the holds the situation was different. The cases were piled in about 15 tiers from the ceiling, five feet above the tanks, to the beams, or nearly. But 15 tiers were not uncommon and had not in the past caused trouble; indeed, cargoes came through 22 tiers in height, and made good delivery. Nor did the ventilation shafts under the square of the hatches give way or cause any shift.

It is quite true that the lowest tiers were badly crushed and much loss occurred thereby. But that might have been due to the fact that the cases were uncommonly frail, as there was good reason to suppose from the evidence relating to the wood used for the covers.

It is argued that, as the cases lay on their sides, the support was in the heavier end pieces, whose wood was, so far as appears, strong enough. But the libelant fails to recognize the part which the covers must have played in holding fast the ends. As long as the ends remained vertical, the thrust of the upper tiers was straight along the grain; but as the ship worked in the sea there would be lateral strains, which must be taken up by the covers or "shocks" between the ends. If these were brittle, and not tough, they would more easily yield, and, once the ends were thrown out of vertical, they would cease to act as effective bearings, and the cases might easily be crushed, just as they were. So we understand Pilcher to have testified. The same cause might account for the small shift which was observed.

[4] But we think it unnecessary to make any finding on this question. It is enough that the damage was shown to be due to an excepted cause, and that the libelant has shown no negligence, but that the ship has proved the stowage good. We have not forgotten the testimony of Sweeny that it was customary to set what he called "dunnage" at intervals across the tiers, apparently to distribute the weight more generally. Not only does this testimony stand alone and contradicted, but it is apparent that as this stiffening, or whatever it may be deemed, was not anchored at the ship's side, it could not relieve the lower tiers of the least part of the weight, but indeed a little increased it. All that it could do was possibly to prevent a shift in the cargo. Considering that the stow was solid from side to side, we can see no reason for adding such a supposed precaution. Therefore we exonerate the ship and the Cunard Steamship Company from any damage before discharge. As the ship had no part in the discharge, and is not liable after the cargo clears the rail, we affirm the decree as to her.

[5, 6] There remains the liability of the company for the discharge. This was done by slings which we think were improper. While it is quite true that platforms, the alternative means, were not generally used at the time, they have since become the accepted apparatus for such cargo, and were used in unloading the Ellerdale at the same time. Apparently the only reason for not using them on the Bencleuch was that none were then available. It was in war time and their absence is readily understood. Certainly, after the discharge began to show the character of the cases, slings ought at once to have been abandoned. But we go further and hold that they were not a proper means at all. The whole weight of the draught bore against those cases under which the ropes ran, and in some cases the lemons were actually squeezed out. Furthermore, there was damage as the draughts were put on the wharf,

and in the transfer from one pier to another, which was apparently done with great indifference to the safety of the cases. All this was properly damage for which the Cunard Company is responsible. Therefore, on a new reference, the libelant may show, if he can, the damage done by these two causes; the burden resting on him to distinguish it from that done in the holds.

[7] The bills of lading in the clause quoted above exempted the company from any claim, notice of which was not given before the removal of the goods. This clause has been so often the subject of discussion in this court that we content ourselves with a reference to the last case, very recently decided, of Anchor Line v. Jackson, 9 F.(2d) 543 November 9, 1925. It is valid and must be enforced. The bills were issued by the company and required notice to it or its agents. A libel filed in rem against the ship was not a compliance with the requirement; it did not advise the company to prepare against the claim. Rather it indicated a purpose to hold only the ship, with which, at least primarily, the company had nothing to do. Hence we hold that no damages may be recovered for any goods removed before some notice was given to the company, and that the libel will not answer as such.

It is argued that the company has raised no such point and did not plead it. But the cause must in any case go back for a new hearing, and we need not decide whether it would have been ground for a reversal, had it stood alone. We can see no reason, especially in a case drawn out as this has been, why the respondent should not amend its answer, even at this late stage, and prove any defense it may have upon the new reference. This we say quite independently of our express ruling in the General George W. Goethals, 298 F. 935.

[8] Next we will allow the amendment, asked by the respondent, setting up the clause in limitation of liability. This the respondent asked leave to plead, and was denied below, unwarrantably in our judgment. We do not say that, if the clause had gone to a defense, properly pleadable before trial, the District Judge might not have been right; but it sought to set up matters relevant only on the reference, which it was clearly erroneous to refuse, when application had been made before the reference had begun. Delays ought not to prevent the very right from appearing, unless the other side will be prejudiced. Upon the new reference the company may limit its recovery according to that clause.

[9, 10] As to the lemons seized and condemned by the board of health, the clause did not apply which required notice before removal; the shippers did not themselves remove the goods, and had no power to prevent their removal. So far as the breakage in the slings or on the wharf and the delay due to the confusion of marks contributed to the decay which resulted in the seizure, the company is responsible. So far as it occurred in the Bencleuch's holds, it is on the libelant's account. It may be impossible to show how much was caused by the company's fault so limited, but we leave the question open for proof. It must be observed, however, that the admission in the bills of lading, received "in apparent good order and condition," goes no further than to create prima facie proof that to the eye the boxes were secure and sufficient, and that the lemons, so far as visible, were not damaged. It does not prove that the fruit was inherently sound. The Oriflamme, Fed. Cas. No. 10,571; The California, Fed. Cas. No. 2,314; The Peter der Grosse, L. R. 1 P. D. 414. There is no such proof in the record, but the libelant may be able to supply it.

[11] We do not think that there should be full interest in such a case. The libel was filed on August 10, 1917; the answer of the claimant six months later. No doubt the libelant had little control over the petitions, and the delays in filing the answers of the company till September, 1918, and of the stevedores till February, 1919, are not chargeable to him. Delays are indeed involved in the fifty-sixth rule. But no notice of trial was given till April, 1920, a delay of over 13 months after the cause was at issue. Moreover, after the interlocutory decree was filed on the last day of the year 1920, the hearings were not brought on till September, 1921, and were drawn out till November 10, 1922, quite unnecessarily. There was here a delay of at least two years, for which the libelant is certainly responsible. The interest will therefore begin to run on August 10, 1919, two years after the libel was filed. The Arpillao, supra.

The decree is affirmed as to the claimant with costs in the District Court against the libelant, and with costs in this court against the Cunard Steamship Company. The decree is reversed as to the Cunard Steamship Company, and the cause referred to William Parkin, Esq., as commissioner of this court, to fix the damages in accordance with the foregoing opinion, unless the parties can come to some agreement as to their amount.